Filed 4/30/26  P. v. Zavaleta CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　v.<br><br>JULIO ZAVALETA,<br><br>　　Defendant and Appellant. | B341711<br><br>Los Angeles County<br>Super. Ct. No. TA160579 |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Connie R. Quinones, Judge. Affirmed.

　　　　Keilana Truong, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　　Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Sophia A. Lecky, Deputy Attorneys General, for Plaintiff and Respondent.

After the trial court denied mental health diversion, defendant and appellant Julio Zavaleta pleaded no contest to one count of assault with a semiautomatic firearm. Zavaleta contends the trial court abused its discretion in denying diversion. We find no abuse of discretion and affirm.

## I.

### A.     *Facts Underlying Zavaleta's Conviction*

We summarize the facts supporting Zavaleta's conviction, as reflected in the preliminary hearing transcript and documents that formed the factual basis of Zavaleta's plea, including the probation report.

On the evening of June 23, 2023, 31-year-old Zavaleta arrived at the home of his father, Julio Zavaleta, Sr., and paternal grandmother, Elva Mercado. When Zavaleta's father opened the front door, Zavaleta grabbed him by the neck, placed a firearm to his neck, and said "I'm going to kill you." Zavaleta then struck him on the top of the head with the firearm, resulting in a head wound. Both Zavaleta's father and his grandmother, who heard the altercation from inside the home, later informed responding officers they had felt afraid due to Zavaleta's conduct.

Zavaleta left his father's home and called his mother, Gabriela Valdez, telling her he was on his way to her home. Valdez met Zavaleta outside her residence, later reporting to police that Zavaleta was upset because his family "didn't visit him while he was in jail." Zavaleta told Valdez he had "shot his father in the head." Zavaleta withdrew a firearm from the front of his waistband, pointed it toward the ground, and told Valdez he was going to kill her. Valdez "told him if he was going to do it, do it." She turned away. Zavaleta then fired two to three rounds

in the air. Officers recovered three bullet casings at the scene, "approximately 20 to 25 feet from the residence of Ms. Valdez."

One month later, officers spotted Zavaleta outside his father's residence and arrested him without incident.

**B.    *Trial Court Proceedings***

The People charged Zavaleta with assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)); two counts of criminal threats (Pen. Code, § 422, subd. (a)); and discharging a firearm with gross negligence (Pen. Code, § 246.3, subd. (a)). (Further undesignated statutory references are to the Penal Code.) Zavaleta filed a motion for mental health diversion pursuant to section 1001.36, which the trial court denied. Zavaleta then pleaded no contest to the assault count. The trial court dismissed the other counts and sentenced Zavaleta to the middle term of six years in state prison with credit for 804 days of time served and good behavior. Zavaleta appealed, challenging only the trial court's denial of diversion.

## II.

**A.    *Mental Health Diversion Framework***

The Legislature enacted sections 1001.35 and 1001.36 in 2018 "to create a pretrial diversion program for defendants with certain mental health disorders." (See *Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 133 (*Vaughn*).) This diversion program "allows for the suspension of criminal proceedings and potential dismissal of charges upon successful completion of mental health treatment." (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 890 (*Sarmiento*).) The program aims for "[i]ncreased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal

3

justice system while protecting public safety." (§ 1001.35, subd. (a).)

To obtain mental health diversion, a defendant must be both eligible and suitable. (§ 1001.36, subd. (a).) Eligibility requires (1) a diagnosis with a specified mental health disorder that (2) "was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(1)–(2).) A defendant is suitable if (1) in the opinion of a qualified mental health expert, the defendant's disorder would respond to treatment; (2) the defendant consents to diversion and waives his speedy trial rights; (3) the defendant agrees to comply with treatment requirements; and (4) the defendant will not pose an "unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community." (*Id.*, subd. (c)(1)–(4).)

"An unreasonable risk of danger to public safety as defined in section 1170.18, subdivision (c), means 'an unreasonable risk that the [defendant] will commit a new violent felony' within the meaning of section 667, subdivision (e)(2)(C)(iv), which felonies are 'colloquially referred to as "super strikes." ' [Citation.] 'Those super strikes are murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, or any sexually violent offenses or sexual offense committed against minors under the age of 14.' [Citation.] In making the unreasonable risk of danger to public safety determination, the court 'may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the

4

current charged offense, and any other factors that the court deems appropriate.' " (*Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 679; accord, *People v. Moine* (2021) 62 Cal.App.5th 440, 449–450 (*Moine*).)

Even if a defendant meets all statutory requirements for mental health diversion, the ultimate grant of diversion is discretionary. (§ 1001.36, subd. (a) ["[T]he court may, in its discretion, . . . grant pretrial diversion to a defendant" if the defendant is both eligible and suitable]; Assem. Com. on Public Safety, Analysis of Sen. Bill No. 215 (2017–2018 Reg. Sess.) as amended Jan 25, 2018, p. 7 ["If a judge feels that a defendant's participation in a diversion program is not appropriate from the standpoint of public safety, or any other reason, the judge can prohibit the defendant from participating in diversion"].) But this residual discretion must be exercised " 'consistent with the principles and purpose of the governing law.' " (*People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 891; see *People v. Williams* (2021) 63 Cal.App.5th 990, 1001 (*Williams*) ["[t]he scope of discretion always resides in the particular law being applied"].) "Where the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals." (*Sarmiento, supra*, 98 Cal.App.5th at p. 893.)

We review the court's denial of a motion for mental health diversion for abuse of discretion. (*Vaughn, supra*, 105 Cal.App.5th at p. 135; *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147 (*Whitmill*).) "A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or

5

implied factual findings that are not supported by substantial evidence." (*Moine, supra*, 62 Cal.App.5th at p. 449.)

###### B.     *Zavaleta's Motion*

In his motion for mental health diversion, Zavaleta argued he met the statutory eligibility and suitability requirements. To do so, he included the psychological evaluation of Dr. Ann L. Walker. Dr. Walker determined Zavaleta met the diagnostic criteria for schizophrenia, bipolar disorder, and post-traumatic stress disorder, as well as "severe opioid, cannabis, alcohol, stimulant and sedative, hypnotic, or anxiolytic use disorders." Zavaleta's reports of "auditory hallucinations and paranoid delusional ideation" and his "pressured speech and confused, tangential, and disorganized thinking" supported a schizophrenia diagnosis. Zavaleta also reported experiencing both depression and extended manic episodes symptomatic of bipolar disorder. He demonstrated "a strong startle response," hypervigilance, and "a restricted range of affect," and reported experiencing "frequent intrusive memories" and flashbacks since being shot in 2022, all characteristic of post-traumatic stress disorder. Dr. Walker also found Zavaleta displayed evidence of various substance use disorders, noting Zavaleta's "drug and alcohol abuse has caused relationship issues and conflict with others" and Zavaleta "has given up other activities to abuse alcohol and drugs."

Dr. Walker opined Zavaleta's mental disorders "played a significant role in Mr. Zavaleta's commission of the instant offenses." Zavaleta reported he "had used methamphetamine and Xanax and was drinking alcohol prior to" committing the instant offenses. Zavaleta further reported that, at the time of the offenses, he "was experiencing prominent and intense auditory hallucinations and paranoid delusional ideation," "felt like his

6

family wanted to harm him," "could not think," and "felt compelled to fight in what he perceived as a dangerous situation." Dr. Walker noted these experiences are typical of a post-traumatic stress flashback in which someone who, like Zavaleta, previously experienced a trauma, is "thrust back into the experience of the original trauma" and "react[s] without being able to think through what they are doing."

In Dr. Walker's opinion, "Zavaleta's symptoms motivating the criminal behavior [of the instant offenses] would respond to mental health treatment." She further stated Zavaleta "would be very appropriate for a dual diagnosis program that could provide psychiatric treatment and psychotherapy . . . and substance abuse treatment" concurrently. She believed "Mr. Zavaleta has a good prognosis for treatment since he is motivated, and able to learn from his mistakes."

Upon conducting a violence risk appraisal, Dr. Walker concluded: "Mr. Zavaleta shows a medium risk for future violent behavior. Mr. Zavaleta presents with medium risk for future dangerousness to the community. M[r.] Zavaleta's history of prior arrests and prior incarcerations is the primary reason that he tested in the medium risk range." Nevertheless, Dr. Walker declared, in her opinion, "Mr. Zavaleta does not present an unreasonable risk of danger to public safety" under section 1170.18.

Dr. Walker's report recommended a treatment plan for Zavaleta with these components: (1) residential treatment, which is "more secure" than other options; (2) meetings with a psychiatrist every two to three months "to stabilize [Zavaleta's] moods and ameliorate or eliminate the hallucinations or paranoia"; (3) individual or group psychotherapy "to help

7

[Zavaleta] learn to modulate his moods and help him develop ways to cope with the hallucinations and paranoia"; and (4) weekly "group substance abuse treatment" and "self-help groups such as [Narcotics Anonymous] or [Alcoholics Anonymous]." Dr. Walker concluded such a plan would "meet the specialized needs of Mr. Zavaleta."

Zavaleta also accompanied his motion with a letter of admission from the Gift of Life Sober Living Foundation, a residential treatment program. After the People raised concerns the letter did not make sufficiently clear whether the treatment program met Dr. Walker's requirements, Zavaleta submitted a second, amended letter.

According to the amended letter, Zavaleta "me[t] the eligibility criteria for admission into the substance abuse disorder (SUD) treatment program provided by Gift of Life Sober Living." The letter continued: "Gift of Life Sober Living is a 6-month to 1-year residential treatment program. The program provides dual-diagnosis treatment, offering psychotherapy and psychiatric services in addition to substance abuse treatment. The program provides one-on-one and group counseling weekly and . . . mental health services to the residents on site. The program also provides outpatient psychiatric services. . . . The client will be required to take all prescribed psychiatric medications. The client will also attend relapse prevention classes, rehabilitation issues education, anger management classes, and will be required to obtain a 12-step sponsor and actively work a 12-step program. Clients are required to attend groups or meetings every day except Sunday. Individuals breathalyze daily and submit to random urinalysis screening every month and as required."

At the hearing on his motion for mental health diversion, Zavaleta argued the Gift of Life Sober Living program "fits all of the criteria that [Dr. Walker] recommended." He further argued his criminal record did not provide "sufficient evidence that he would pose a danger of committing a superstrike."

The trial court denied Zavaleta's motion, explaining its reasoning at length. The court focused its analysis on suitability and observed "[t]he question the court has to ask itself is whether or not Mr. Zavaleta presents an unreasonable risk [to] public safety to the community." The court noted "[t]he facts in this particular case are particularly violent," stating that making "[a] threat against a family member, going to their home" and threatening " 'I'm going to kill you' " "elevates" the gravity of a threat crime to a "significant degree." The court further declared the crime was "aggravated by the presence of a weapon, a gun," which Zavaleta fired.

The court laid out Zavaleta's criminal history, identifying the following convictions and sentences: (1) in 2014, misdemeanor vandalism, with a grant of summary probation and three days in jail; (2) in 2014, felony arson and possession of a controlled substance, with a sentence of 16 months in state prison; (3) in 2015, felony vandalism at a place of worship, with a 32-month state prison commitment; (4) in 2018, assault with a gang enhancement, with a two-year sentence in state prison; and (5) in 2020, felony evading a peace officer, with a 32-month state prison commitment. From this history, the court concluded "that the level of violence and potential for harm has not abated despite [Zavaleta's] prison commitments. If anything, based on the allegations in this case, . . . the potential for harm to other individuals has increased."

The trial court considered the underlying purpose of the mental health diversion statute, declaring: "I have to look at the spirit of the mental health diversion, which is to give individuals that have legitimate mental health concerns — and I think Mr. Zavaleta does — the opportunity to work with treatment providers and potentially earn a dismissal." Yet the court continued: "In this particular case I don't feel Mr. Zavaleta is a suitable candidate for mental health diversion for the reasons that I stated. His extensive criminal history, the fact that he's been committed to state prison on several occasions, the criminal conduct and potential for harm has increased over time." The court concluded: "A defendant can meet the criteria for mental health diversion but ultimately the court has the discretion, and it details its reasons. And in this case, I think I've made a sufficient record for such."

## C.   *Denial of Diversion Not an Abuse of Discretion*

Zavaleta argues "it is unclear whether the trial court found [Zavaleta] posed an unreasonable risk of danger to public safety or whether the court exercised its residual discretion when it denied diversion." The court did both, specifically finding Zavaleta unsuitable while invoking the suitability criteria that a defendant not present an unreasonable risk to public safety and, separately, invoking its residual discretion. Zavaleta argues the court abused its discretion regardless, "because substantial evidence does not support a finding that [Zavaleta] poses an unreasonable risk of danger such that he is likely to commit a super strike and denial of diversion based on the court's residual discretion is inconsistent with the underlying purpose of the mental health diversion statute."

10

We first examine whether substantial evidence supports the trial court's finding that Zavaleta is unsuitable for mental health diversion because he poses an unreasonable risk to public safety if treated in the community.  (See § 1001.36, subd. (c)(4).)  "[A] defendant is not suitable for diversion if the defendant is 'too dangerous to be treated in the community because he would commit a new violent super strike.' " (*People v. Graham* (2024) 102 Cal.App.5th 787, 799.)

We conclude substantial evidence supports the trial court's unreasonable risk finding.  As the trial court observed, Zavaleta has an extensive criminal history, with prior felony sentences totaling more than eight and a half years in less than a decade.  Both Zavaleta's criminal record and his current offenses include acts of violence.  His instant offenses are his most violent yet and demonstrate an escalation in violence and criminality.  Zavaleta visited the homes of each of his parents without provocation to terrorize them with a firearm.  Zavaleta grabbed his father by the neck, placed the firearm to his neck while threatening to kill him, and struck an injurious blow to the head with the firearm.  He then went to his mother's home and threatened to kill her as well, pulling out the firearm and telling her he had just shot his father in the head before discharging the firearm three times in her presence.  Accordingly, there was a bridgeable gap from Zavaleta's charged offenses to murder or attempted murder, each a super strike.  (See *People v. Hall* (2016) 247 Cal.App.4th 1255, 1266 ["[w]e cannot limit the trial court's discretion to offenders who have already committed a super strike offense without construing subdivisions (b) and (c) of section 1170.18 as meaningless surplusage"]; *People v. Bunas* (2022) 79 Cal.App.5th 840, 861–862 [a court may properly find a defendant unsuitable

11

for diversion relying primarily on the circumstances of the charged offense]; *People v. Pacheco* (2022) 75 Cal.App.5th 207, 213–214 [courts look to anticipated future conduct].)  Zavaleta himself appears to have believed he had committed a homicide offense, telling his mother he had shot his father in the head when he had instead struck him with the firearm.

Further, Dr. Walker understood Zavaleta to present a medium risk of future violence, and the letter from Gift of Life Sober Living outlining Zavaleta's proffered treatment program gives no assurance that there would be safety barriers to protect the community from Zavaleta were he to enroll in the program. Although Dr. Walker ultimately concluded, in language mirroring the diversion statute, that Zavaleta was not an unreasonable risk of future harm — despite her assessment of medium risk of violence — the trial court could reject that ultimate conclusion. (*People v. Bean* (1988) 46 Cal.3d 919, 933, fn. 4; *People v. Nelson* (2026) 118 Cal.App.5th 1105, 1109.)

Zavaleta compares his case to *Whitmill, supra,* 86 Cal.App.5th 1138, and *Williams, supra,* 63 Cal.App.5th 990, in which appellate courts reversed orders denying mental health diversion.  They are distinguishable.

In *Whitmill*, the defendant, a 61-year-old veteran experiencing PTSD from sexual violence suffered during his military career, took out a firearm during an incident with his girlfriend and her friend.  When the friend approached the defendant, who appeared unwell, the defendant verbally warned the friend to back off and then "negligently fired a single shot in the air away from those nearby and then threw the gun away and turned himself in" to law enforcement without incident.  There was conflicting evidence that defendant, after firing the shot, said

12

to his girlfriend, "[b]itch, I'll kill you." (*Whitmill, supra,* 86 Cal.App.5th at pp. 1142–1143, 1155.) After the trial court denied defendant's motion for diversion, he pleaded no contest to discharge of a firearm with gross negligence and all other charges, including a criminal threats charge, were dismissed. (*Id.* at p. 1147.) "This unusual scenario," we said, was "a far cry from indicating that appellant is likely to commit a super-strike offense in the future." (*Id.* at p. 1151.) In contrast to Zavaleta, the defendant in *Whitmill* had no violence in his criminal history, which "consist[ed] of possession and sales of drugs and theft." (*Id.* at p. 1151.) Further, Zavaleta's charged conduct was significantly more concerning. He went out of his way to target family members. Again, Zavaleta grabbed his father by the neck, placed his firearm to his neck, threatened to kill him, and then used the firearm to strike him in the head. Zavaleta later used the firearm to threaten his mother's life before discharging the firearm three times immediately adjacent to her home. Zavaleta ultimately pleaded to an intentional assault, not the negligent discharge of a weapon. In short, both Zavaleta's criminal record and his current offenses demonstrated a significantly greater likelihood Zavaleta's future actions posed an unreasonable risk of violence if treated in the community.

Similarly distinguishable is *Williams, supra*, 63 Cal.App.5th 990, a felony stalking case, where the appellate court reversed a denial of diversion in part because there was no evidence the defendant possessed or had access to any weapons and because defendant had previously been released on bond without incident. (*Id.* at pp. 993–994, 1003–1004.) The defendant in *Williams* had no prior criminal record and, though he made "horrific threats" by email and other writings, "he never

actually assaulted anyone or engaged in any violence" and a mental health expert opined his " 'long-term risk of violence fell within the lowest category.' " (*Id.* at pp. 997, 1003.)  Here, Zavaleta has a more extensive criminal history, including several felony convictions — one being for assault — and Dr. Walker found he poses a medium risk of future violence.  Additionally, Zavaleta's instant offenses were more violent.

While reasonable minds could differ in this case regarding the risk Zavaleta poses if treated in the community, the trial court's finding of unreasonable risk based on the evidence before it is neither outside the bounds of reason nor otherwise arbitrary or capricious.  Accordingly, Zavaleta has not shown an abuse of discretion.

Because we conclude the trial court did not err in finding Zavaleta unsuitable for mental health diversion under 1001.36, subd. (c)(4), we need not consider Zavaleta's claim that the court abused its residual discretion under 1001.36, subd. (a).

## DISPOSITION

We affirm the judgment.

SCHERB. J.

We concur:

WILEY, Acting P. J.          VIRAMONTES, J.

14